THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* MELVIN WATSON *et al.*, Defendants-Appellees.

(No. 55664; )

First District—December 29, 1972.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane and James S. Veldman, Assistant State's Attorneys, of counsel,) for the People.

James J. Doherty, Public Defender, of Chicago, (James N. Gramenos, Assistant Public Defender, of counsel,) for appellees.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

This is an appeal by the State from an order suppressing evidence. The sole issue presented is whether the evidence secured through the search of defendants' persons and effects was admissible as incident to a lawful "stop and frisk." Ill. Rev. Stat. 1969, ch. 38, pars. 107—14 & 108—1.01; *Terry v. Ohio,* 392 U.S. 1; *Sibron v. New York,* 392 U.S. 40.

At the hearing on defendants' motion to suppress evidence, Officer Leroy Almanza testified as follows: On July 24, 1970, he and his partner, Officer Walter Cap, were Chicago police officers assigned to a district on the south side of Chicago. On that date, at approximately 9:00 A.M., the two policemen were approached by a bus driver, who reported the presence of two "suspicious looking young Negro men" in front of a savings and loan association at 51st and Loomis. When the policemen arrived at that location, Officer Almanza observed defendant McCraven standing near a window inside the savings and loan. The policemen entered to investigate. Defendants, both young Negroes, were standing at the teller's window. Defendant McCraven seemed to be nervous and whispered something to Watson, who was apparently transacting business with the teller. When defendants left the savings and loan, Watson kept his right hand inside his pants, "as if he was trying to hide something." As they proceeded east from the savings and loan, they occasionally whispered to each other and looked back at the policemen, who were following in their squad car. Watson still had his right hand in his pants, "as if he was hiding something or pulling something out." In the vicinity of 51st and Ada the policemen emerged from their car and approached defendants, who reacted by separating and proceeding in different directions. Watson was stopped by Officer Cap. McCraven was approached by Officer Almanza who asked him to produce identification and to explain the nature of his business in the bank. McCraven replied that he and his friend had opened a savings account. He produced a passbook as verification. Officer Almanza nonetheless removed a black leather pouch from McCraven's shoulder, opened it, and observed therein a

large amount of coins and a pair of binoculars. His attention was then drawn to Officer Cap, who was displaying a revolver recovered from Watson. Officer Almanza thereupon made a thorough search of McCraven and placed him under arrest.

On cross-examination Officer Almanza testified as follows: The expressed basis of the bus driver's description of defendants as "suspicious" was their presence near a bank in a "white neighborhood." This fact also aroused Officer Almanza's suspicion that defendants were contemplating a bank robbery. However, before pursuing defendants, he had a conversation with the bank receptionist which "satisfied" him that defendants had in fact made a deposit and that "everything was all right in the bank." He also testified that, prior to the search of McCraven, he at no time saw any objects which he suspected were weapons.

Both defendants testified at the hearing. They confirmed that they had been in the savings and loan to make a deposit and that they had observed the police at that time. They also testified that they were doing "nothing" prior to being stopped and searched.

After oral arguments by counsel, the trial judge entered an order allowing defendants' motion to suppress. The order provided in part: "That the aforesaid arrest was made solely upon the suspicion as per the testimony of the arresting officer and that a primary ground of that suspicion was the race of defendants." The State appeals from that order.

It is the State's position on appeal that the encounter between the two policemen and the defendants constituted a valid "stop and frisk," the fruits of which justified the subsequent arrest and search of defendants. This contention requires that the conduct of the policemen have comported with the statutory and unconstitutional standards governing "stop and frisk." The pertinent Illinois statutes are Section 107—14 and Section 108—1.01 of the Code of Criminal Procedure,* which provide as follows:

> "§ 107—14. Temporary Questioning without Arrest.) A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense as defined in Section 102—15 of this Code, and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped.
>
> § 108—1.01. Search During Temporary Questioning.) When a

---

* Ill. Rev. Stat. 1969, ch. 38, pars. 107—14 & 108—1.01.

peace officer has stopped a person for temporary questioning pursuant to Section 107—14 of this Code and reasonably suspects that he or another is in danger of attack, he may search the person for weapons. If the officer discovers a weapon, he may take it until the completion of the questioning, at which time he shall either return the weapon, if lawfully possessed, or arrest the person so questioned."

The above statutes represent a codification of the holdings in *Terry v. Ohio,* 392 U.S. 1, and *Sibron v. New York,* 392 U.S. 40. (*People v. Lee,* 48 Ill.2d 272, 269 N.E.2d 488), which impose three restrictions upon the right of policemen to "stop and frisk" individuals suspected of criminal acts. First, the "stop" itself must be justified by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Terry v. Ohio,* 392 U.S. 1, 21.) Inarticulate hunches cannot suffice; rather, the objective determination to be made is whether "the facts available to the officer at the moment of the seizure * * * warrant a man of reasonable caution in the belief that the action taken was appropriate." (*Terry v. Ohio,* 392 U.S. 1, 22.) Second, assuming a valid "stop," a limited search of the suspect for weapons is justified only if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." (*Terry v. Ohio,* 392 U.S. 1, 27.) Finally, the search authorized in *Terry* is one confined in scope to an intrusion reasonably designed to discover objects capable of use as weapons. *Terry v. Ohio,* 392 U.S. 1, 29; *People v. Lee,* 48 Ill.2d 272, 276, 269 N.E.2d 488.

These principles have not been subjected to significant elaboration or clarification by subsequent Supreme Court cases, with the exception of the recent case of *Adams v. Williams,* 407 U.S. 143, wherein it was held that reasonable cause for a stop and frisk may be based on either personal observation or on an informant's tip if it bears "indicia of reliability."

Applying the above rules to the facts in the case at bar, we conclude that the searches of both defendants violated the aforementioned Illinois statutes and the constitutional rights of defendants. The record reflects no "specific and articulable" facts which could have generated "rational inferences" warranting the "stop" of defendants. The allegations of the bus driver did not constitute a tip "bearing indicia of reliability"; it fell within a second classification of tips described in *Adams v. Williams,* 407 U.S. 143, 147, as "completely lacking in indicia of reliability" and which "warrant no police response or require further investigation before a forcible stop of a suspect would be authorized." Certainly the presence of black men within a so-called "white neighborhood" did not justify such an intrusion; nor do we believe that defendants' allegedly suspicious

appearances, whisperings and hand movements reasonably suggested that their presence within the savings and loan was for other than lawful purposes. Any suspicions to the contrary should have been dispelled by the reassurances of the receptionist. We are left with no more than a police officer's inarticulate hunch that criminal acts had been committed or were contemplated. This was insufficient to justify the "stop." *Terry v. Ohio,* 392 U.S. 1; *People v. Lee,* Cf. 48 Ill.2d 272, 269 N.E.2d 488; *People v. Davis,* 2 Ill.App.3d 185, 276 N.E.2d 55; Ill. Rev. Stat. 1969, ch. 38, par. 107—14.

We hold that the evidence secured through the searches of defendants' persons and effects was not obtained incident to a valid "stop and frisk." We affirm.

Affirmed.

SCHWARTZ and LEIGHTON, JJ., concur.