THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN PALMER, Defendant-Appellant.

(No. 57756; ■■■■■■■■)

First District (2nd Division)—September 30, 1974.

James J. Doherty, Public Defender, of Chicago, (Marilyn Dershem Israel, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago, (Kenneth L. Gillis and John M. Cutrone, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE HAYES delivered the opinion of the court:

In order to present the fact situation involved in this warrantless, pat-down, pre-arrest search of defendant's person for weapons, incident to a traffic stop of defendant for the observed traffic violation of driving without State license plates (Ill. Rev. Stat. 1971, ch. 95½, par. 3—701(1)), the following narrative account collates the total testimony of both the arresting officer and the defendant taken during the hearing on a motion to suppress the physical evidence, at the trial, and at the hearing in aggravation and mitigation. There was no direct conflict in their testimony as to the details of the incident.

Defendant curbed his car on Ogden Avenue (a heavily travelled street) in Chicago at 11:10 A.M. on 12 October 1971 and parked it. In the front passenger seat was a lady (who was a friend of defendant's cousin) with a baby. Defendant was driving the lady and the baby to a doctor's office, and the place where defendant parked was in front of the doctor's office. When defendant parked his car, the arresting officer was in a car behind defendant's car, and the officer then observed that defendant's car had no rear State license plate. Defendant helped as the lady got out of the car with the baby; then he closed the car door and pulled away from the curb. The officer did nothing until defendant had pulled away from the curb, whereupon the officer in his car stopped defendant in his car, solely for the personally observed traffic violation of driving without State license plates.

The officer got out of his car and went to defendant's car to question defendant. He asked defendant how long it had been since defendant had bought his car. Then he asked to see defendant's driver's license. Defendant could not produce the license. At the time defendant could not produce the license, defendant was standing outside his own car, going through his wallet. Defendant did not in fact have a driver's license, but he allegedly did have a "yellow slip" showing that he had applied for a driver's license (which "yellow slip" was presumably an official temporary driver's license pending the issue of the license applied for), and he was going through his wallet trying to find and produce the "yellow slip".[1] The officer testified that defendant had been completely

---

[1] The record does not disclose whether in fact defendant did or did not have the "yellow slip" in his wallet or otherwise in his immediate possession, or whether in fact he ever displayed it to the officer or indeed whether in fact such a "yellow slip" had in fact been issued to defendant. The failure of defendant to have the "yellow slip" in his immediate possession and to display it to the officer on the officer's demand would have been a violation of section 6—112 of the Illinois Vehicle Code (Ill. Rev. Stat. 1971, ch. 95½, par. 6—112). Had no such "yellow slip" been issued to defendant, defendant would have been in violation of section 6—101(a) of the Code (Ill. Rev. Stat. 1971, ch. 95½, par. 6—101(a)).

cooperative throughout the questioning, other than appearing nervous, and had given the officer no undue cause for alarm or cause to fear for his safety.

It was at this point that the officer made a "pat-down" search of defendant's person for weapons. He felt a metallic object in defendant's right rear trouser pocket. He then removed from the pocket a pouch containing the metallic object which he had felt. The pouch resembled a tobacco pouch and had a zipper which was partially open. When the officer looked at the pouch, he saw the butt of a pistol protruding from the unzipped part of the pouch. He removed the pistol from the pouch and observed that it was a .25-caliber pistol loaded with four live cartridges. He promptly arrested defendant for the offense of unlawful use of weapons. Defendant offered no resistance whatever. The officer then gave *Miranda* warnings and advice to defendant, whereupon defendant refused to answer any questions. The officer asked defendant to produce a State firearms identification card, but defendant did not do so. The officer then asked defendant to produce a Chicago owner's registration card, but defendant did not do so.

Defendant was charged with unlawful use of weapons (Ill. Rev. Stat. 1971, ch. 38, par. 24—1(a)(4)), failure to produce a State firearms identification card (Ill. Rev. Stat. 1971, ch. 38, par. 83—2(a)), and failure to produce a Chicago owner's registration card. At trial, defendant testified that, immediately after he had closed the car door upon the departure of the lady with the baby and as he was preparing to drive off, he had seen the pouch on the floor of the front seat of his car. The pouch was not his; he had never seen it before, nor had he ever seen either the lady or his cousin with it. He did not know what was in the pouch, either when he saw it or when he put it into his right rear pants pocket. He did not own the pistol, nor did he own any weapons. Because he did not own the pistol, he had neither a State firearms identification card nor a City owner's registration card.

During the hearing in aggravation and mitigation, defendant stated that he had applied for State license plates and a City vehicle sticker 2 days after he got his car, but had not received either at the time of the incident, because he had forgotten to put his social security number on the applications, so the applications had been returned to him.

On the basis of the testimony of the arresting officer at the hearing on the motion to suppress the pistol as evidence because it had been obtained by means of an illegal search of his person, the trial judge denied the motion. That testimony was then stipulated to at the trial, which immediately followed the hearing on the motion, and further testimony of the officer plus the testimony of defendant was then given at the trial.

The trial was a bench trial on pleas of not guilty to all three charges.

On the basis of the total testimony, the trial judge found defendant guilty of the offenses of unlawful use of weapons and of failure to have a State firearms identification card, but not guilty of failure to have a city owner's registration card (owing to defendant's testimony that he did not own the pistol and owing to the absence of any testimony that he did own it). Defendant was sentenced to 60 days in the House of Correction on each of the two charges on which he had been found guilty, the sentences to run concurrently. Defendant appeals from the convictions, urging that the trial court erred in denying his motion to suppress.

The recent decisions of the United States Supreme Court in *United States v. Robinson* (1973), 414 U.S. 218, and *Gustafson v. Florida* (1973), 414 U.S. 260, are not in point. Those cases involved thorough searches of the person following a warrantless but valid custodial arrest for an allegedly "minor" traffic offense personally observed by or known to the arresting officer. The searches disclosed items other than weapons and unrelated to the traffic offense for which the custodial arrest had been made, which unrelated items then became the basis for the offense for which the arrested person was ultimately charged and tried. The holdings were that the valid custodial arrest justified the thorough warrantless search of the person for any item which might conceivably be a weapon.[2]

In the instant case, the search was a warrantless, pre-arrest, pat-down search for weapons, which disclosed a weapon. The fact that the search for weapons disclosed a weapon (which thereupon became the basis for offenses for which the defendant was ultimately charged, tried, and convicted) might appear to justify the search, but the fact that the search was a pre-arrest search requires that it meet the standards for such searches established in *Terry v. Ohio* (1968), 392 U.S. 1, and *Sibron v. New York* (1968), 392 U.S. 40, as subsequently codified in Illinois. (Ill. Rev. Stat. (1971), ch. 38, pars. 107—14 and 108—1.01.) The sole issue, therefore, which we decide on this appeal is whether the warrantless,

---

[2] We are aware of the decision of the First Division of the First District of this Court in *People v. Cannon* (1974), 18 Ill.App.3d 781, 310 N.E.2d 673, holding that the *Robinson* and *Gustafson* decisions of the United States Supreme Court were applicable to the facts of that case so that the warrantless search of the car in that case did not violate the fourth amendment rights of the defendant. But the *Cannon* case is distinguishable from the instant case in that in *Cannon* the Court expressly found that the search of that area of the car which was in the immediate proximity of the defendant-front-seat-passenger was essential to insure the safety of the arresting officer, whereas in the instant case the officer himself testified that he had been given no cause to fear for his safety nor had he in fact had any such fear.

pre-arrest, pat-down search of the person of appellant for weapons, following a routine traffic stop for the violation of driving without State license plates plus the later discovered violation of driving without being in the immediate possession of a valid driver's license or permit, was proper when measured by the *Terry, Sibron,* and Illinois statutory standards.

In *Terry v. Ohio, supra,* a police officer with considerable law enforcement experience observed three men walking back and forth in front of a store. It appeared to the officer from their actions that these three men were contemplating a daylight robbery, an offense frequently associated with the use of weapons. When the officer stopped the men for questioning, he conducted a pat-down of their clothing for weapons, which disclosed that two of the three men were armed. In affirming the conviction of Terry for carrying a concealed weapon, the Court held that, when the facts indicate to an officer that criminal activity may be afoot and that the persons whom he is investigating may be armed and presently dangerous, it is proper to conduct a limited pat-down search for weapons. The officer's conduct is to be assessed against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief that the action taken was appropriate." The persuasive facts justifying the search in *Terry* were the suspicious conduct of the three individuals and the fact that it would be likely for a daylight robbery to involve weapons.

The defendant in *Sibron, supra,* was convicted of the unlawful possession of heroin. At the hearing on the motion to suppress, the arresting officer testified that, while he was patrolling his beat, he observed defendant for a period of 8 hours, during which time he saw defendant in conversation with six to eight known narcotic addicts. He did not overhear any of the conversations. After approaching defendant, the officer told him, "You know what I am after," whereupon defendant placed his hand in his pocket. Simultaneously, the officer placed his hand in the same pocket and discovered small packages of a white substance alleged to have been heroin. The officer did not claim that, when Sibron put his hand in his pocket, he (the officer) reasonably believed that Sibron was going for a weapon or that he (the officer) was acting in self-defense when he placed his hand in Sibron's pocket. The Court reversed the conviction saying:

> "The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for

doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." (392 U.S. at 64.)

Not only did the officer not have grounds to search for weapons, his search went beyond the limited pat-down approved by *Terry*.

The thrust of both *Terry* and *Sibron* is that a warrantless, pre-arrest, pat-down search for weapons is justified only when the officer has reasonable grounds to fear for his safety or for the safety of others. This is also the thrust of the Illinois statutes governing this situation, which were enacted following the decisions in *Terry* and *Sibron*. See *People v. Lee* (1971), 48 Ill.2d 272, 269 N.E.2d 488. Section 107—14 of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 107—14) authorizes a police officer to temporarily question an individual without arrest. Section 108—1.01 of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 108—1.01) deals with searches during temporary questioning. That section provides in part:

"When a peace officer has stopped a person for temporary questioning  *  *  *  and reasonably suspects that he or another is in danger of attack, he may search the person for weapons."

Having reviewed the record in the case at bar in light of these standards, it is our opinion that defendant's conviction must be reversed.

The testimony of both the officer and of defendant demonstrates that, during the temporary questioning following the traffic stop at 11 o'clock in the morning on a heavily travelled street for the observed offense of violating section 3—701(1) of the Illinois Vehicles Code (Ill. Rev. Stat. 1971, ch. 95½, par. 3—701(1)), defendant was completely cooperative, and the officer's own testimony was that defendant gave him no cause for alarm. In the instant case, the mere facts that license plates were missing and that the individual then cannot produce a driver's license or permit, without more, do not afford a reasonable basis for believing that that individual is armed and dangerous, nor did the officer in fact so believe. We emphasize that here the pat-down search came before any arrest for the observed traffic violation or for the failure to produce the driver's license. This fact, coupled with the absence of facts warranting the officer reasonably to suspect that he was in danger of attack, rendered the search improper.

For the foregoing reasons, defendant's convictions are reversed.

Reversed.

DOWNING, J., concurs.

Mr. JUSTICE LEIGHTON specially concurring:

This case involves the most common kind of police-citizen confrontation in our motorized society: the occasion when a peace officer has reason to believe that a motorist has committed a minor traffic violation. Statistics tell us that minor traffic violations occur millions of times each year in our community. And when they do, they bring the police and the citizen into contact in a way that increases the importance of constitutional guarantees against unreasonable searches and seizures. Therefore, I concur in all that has been said by Mr. Justice Hayes for the court, but add these words of my own to emphasize what, to me, is the guiding rule of our decision.

. The traffic violation which Officer Vuko thought defendant was committing on October 12, 1971, was punishable by a fine of not more than $100 or imprisonment for not more than 10 days. (Ill. Rev. 1969, ch. 95½, par. 3-833.) It was an offense for which the law did not require custodial arrest; and in this community, by a practice of long standing, Officer Vuko would have given defendant a traffic ticket, the equivalent of a civil summons.

What is more important, however, is that according to Officer Vuko, he had no intention of making an arrest; nothing had been done by defendant to cause Vuko alarm or make him fear for his safety. Notwithstanding, Vuko decided to "pat-down" defendant's person. This, or the "frisk," as it is sometimes called, was a search. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868.) And, since by Vuko's own testimony it was without justification, it was illegal. "Under our system suspicion is not enough for an officer to lay hands on a citizen." (*Henry v. United States* (1959), 361 U.S. 98, 104, 4 L.Ed.2d 134, 80 S.Ct. 168.) Therefore, the gun which Officer Vuko said he found on defendant's person was not admissible in evidence; it should have been suppressed by the trial court.

- For these reasons, I would emphasize that when a peace officer stops a motorist for a traffic violation which does not require custodial arrest and the peace officer does not intend to make one, the "pat-down," "frisk," search or touching of the motorist by the officer is illegal, unless there is some act or conduct, or some fact or circumstance which causes the peace officer reasonably to believe it necessary to "pat-down," "frisk," search or touch the motorist in order to protect himself or those around him. *People. v. Watson,* (1972), 9 Ill.App.3d 397, 292 N.E.2d 457; compare *People v. Evans* (1973), 13 Ill.App.3d 588, 301 N.E.2d 106.