THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DANIEL GARZA, Defendant-Appellant.

First District (3rd Division)   No. 62540

Opinion filed November 18, 1976.

James J. Doherty, Public Defender, of Chicago (James E. Burke, Thomas F. Finegan, and Robert P. Isaacson, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Linda Dale Woloshin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

The defendant, Daniel Garza, was charged with six counts of aggravated battery. He waived a jury, was found guilty by the trial court on four of the counts and was sentenced to 3 to 9 years in the penitentiary. He contends that the trial court committed reversible error in denying his motion to suppress pretrial identifications and evidence, which was seized by the police pursuant to his arrest, because both were products of an arrest that was conducted without probable cause. He also asserts that his in-court and out-of-court identifications by two complaining witnesses and one occurrence witness should have been suppressed because they were based upon impermissibly suggestive identification procedures.

Around 8 p.m. on November 1, 1972, David Koscielski, Arthur Bernt and Jimmy Tucker were standing in front of a tuxedo shop located at 50th Street and Ashland Avenue, Chicago. All three boys were looking in the shop's brightly lighted window when an automobile with four occupants drove up. Garza and one other emerged from the vehicle and asked the group whether they were members of the "Gay Lords." When they answered "no," Garza called them liars and struck Bernt in the eye, causing his glasses to fall to the ground. While Bernt was attempting to retrieve his glasses, Garza hit him over the head with a bottle. Garza then repeated the charge that they were Gay Lords. Koscielski denied the accusation and Garza sliced him across the throat with a knife, described by Koscielski and Bernt as a "linoleum" knife and by Tucker as a "carpenter's" knife. At this point, Koscielski and Tucker ran to a nearby drug store and called the police.

By this time, Bernt had gotten to his feet. Garza began walking towards him and Bernt backed away. Garza then lunged at Bernt and started slashing him on the back with the same knife. Bernt screamed for help and a man in the tuxedo shop opened the door; Bernt ran through the open door and the man telephoned the police.

The police responded to the calls and took the boys to a hospital. Bernt received a total of 164 stitches in his back, around his eye and in the back of his head and was confined in the hospital eight days; Koscielski's throat

required ten stitches. Tucker received no medical treatment since he was not injured in the assault.

In separate interviews with the police, the three boys described their assailants as four male Mexicans or Puerto Ricans, who were in their late teens or early 20's and stated that at least two of the group were wearing black cashmere coats. After receiving the descriptions, the police began touring the area surrounding the location of the attack. About two hours after it had taken place and about seven blocks away, two officers observed four male Mexicans, two of whom were wearing black cashmere coats, standing on a sidewalk. Since they fit the general description given by the victims, the officers decided to question the four men. Garza and his brother were in this group, and one of the officers knew Garza from prior arrests. The officer asked him where he had been for the previous two or three hours. Garza replied that he had been at his brother's house. The officer asked Garza's brother the same question. The brother answered that he had been out. The officer then conducted a "pat-down" of Garza. He discovered a knife which he termed a "box-cutter" in Garza's pants pocket. The officers placed the four men in their squad car, took them to the hospital and brought them, one at a time, into the emergency room where Bernt's and Koscielski's cuts were being sutured. Each man was brought to the bed of each victim. Both Bernt and Koscielski identified Garza as the person who had attacked and cut them, and at least two of the other three men as his accomplices.

The four arrestees were then taken to a police station where a lineup was conducted for Tucker who had not seen them at the hospital. All the participants in the five-man lineup were approximately the same height, age and weight. However, the fifth man had a goatee. Tucker identified Garza and two of the other three arrestees as the perpetrators of the attack on his two friends.

Garza did not take the witness stand at his trial, but his brother, sister-in-law and three friends testified that at the time of the assault, he was with them at a party in his brother's apartment.

Although the arresting officer testified that he did not arrest Garza until after he had been identified at the hospital, the trial court ruled that he was under arrest when he was placed in the squad car. Later, in a discussion as to the amount of his bond following his conviction, the court stated that he thought there was a legal question involving the initial arrest that should be decided by a higher court. The defendant supports his claim that his arrest was illegal with the following: the police officers did not have a warrant for his arrest; he was not committing any crime and one of the arresting officers testified that he had no knowledge that Garza had committed a crime when he was taken into custody, and the same officer stated that he arrested him and his companions because they fit the

general description of the assailants. The defendant argues that a general description is insufficient to provide probable cause for an arrest and that the uncertain incriminating nature of the general description is demonstrated by the fact that the ethnic makeup of the neighborhood, where the assault and arrest took place, is approximately 50 percent Mexican-American and that many young men of this particular racial background wear black cashmere coats. The defendant concludes that the seizure of the knife from his person and his identification by the witnesses at the hospital showups and the police station lineup were a direct consequence of this unlawful arrest, and should have been suppressed because they were tainted with its illegality.

There is a difference between an arrest and the stopping of an individual for questioning. An arrest is the initial stage in a prospective criminal prosecution. It is the taking of a person into custody (Ill. Rev. Stat. 1971, ch. 38, par. 102—5) and is accomplished by an actual restraint of that person or by his submission to custody. (Ill. Rev. Stat. 1971, ch. 38, par. 107—5(a).) On the other hand, a brief, investigative questioning is not an arrest. The Code of Criminal Procedure of our State provides that:

> "A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person * * * has committed an offense * * *, and may demand the name and address of the person and an explanation of his actions." (Ill. Rev. Stat. 1971, ch. 38, par. 107—14.)

The Code of Criminal procedure also provides that during this temporary questioning a peace officer may search the person for weapons if he reasonably believes that he is in danger of attack. Ill. Rev. Stat. 1971, ch. 38, par. 108—1.01.

The existence of probable cause is necessary for an arrest, but it is not a prerequisite to temporary questioning. (See *Adams v. Williams* (1972), 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921.) However, there are restrictions upon the right of a peace officer to stop a person and upon his right to search him. The stop itself must be justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the stop. If the stop is valid, a limited search of the suspect for weapons is justified only if a reasonably prudent man under the same circumstances would be warranted in the belief that his safety or that of others was in danger; and the scope of the search must be restricted to the discovery of objects capable of use as weapons. *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *People v. Watson* (1972), 9 Ill. App. 3d 397, 292 N.E.2d 457.

Garza was stopped when the officers approached him and his

companions and inquired as to their whereabouts at the time of the assault. The stop was justified because the officers had been told that the assailants were four male Latin Americans in their late teens or early 20's and that two of the four wore black cashmere coats. Garza's group was observed by the police seven or eight blocks from the location of the attack. The group was composed of four Mexicans, two of whom were wearing such coats. Additionally, one officer knew, because of prior arrests, Garza's age. These are specific facts and circumstances from which the officers could reasonably suspect that the group might be the one that committed the batteries.

The "pat-down" of Garza's outer clothing was justified because the officers knew that one of the assailants was armed with a knife and had wielded it freely. If the four suspects were actually the assailants, it was reasonable to believe that they were still armed. In this situation, it was both prudent and reasonable for the two officers, confronted by four men, to "frisk" Garza to insure their own safety.

Once the limited search had uncovered the weapon, Garza and the others were placed in the squad car. We agree with the trial court that at this point an arrest had been effectuated.

■■ An arrest may be made without a warrant if a criminal offense has been committed and the arresting officer has reasonable grounds to believe that the person to be arrested has committed the offense. (*People v. Scott* (1968), 100 Ill. App. 2d 473, 241 N.E.2d 579.) The test for the reasonable basis of the officer's belief is whether a reasonable and prudent man in the officer's position and in the possession of his knowledge would believe that the person arrested was guilty of the offense. (*People v. Carroll* (1971), 133 Ill. App. 2d 78, 272 N.E.2d 822.) The officer's belief may be founded on factual and practical considerations of everyday life upon which reasonable and cautious men, not legal technicians, act. (*People v. Colbert* (1973), 10 Ill. App. 3d 758, 295 N.E.2d 225.) A factor that may be considered in judging the reasonableness of the officer's conduct is his responsibility to prevent crime and apprehend criminals. (*People v. Asey* (1967), 85 Ill. App. 2d 210, 229 N.E.2d 368.) Probable cause for an arrest means something less than evidence needed for a conviction (*People v. Peak* (1963), 29 Ill. 2d 343, 194 N.E.2d 322), and the question as to what information is sufficient to establish probable cause is dependent upon the facts and circumstances of each particular case. *People v. McCrimmon* (1967), 37 Ill. 2d 40, 224 N.E.2d 822.

■■ A hunch or a suspicion is not a sufficient reason for arresting a person, and the fact that Garza and his friends answered a general description would not constitute probable cause for his arrest. But he was not arrested until after he had been legally stopped, questioned and searched. The questioning produced what the officers thought was a

contradiction between Garza's answer and his brother's concerning their whereabouts. The "frisk" produced a knife that was not a typical pocket knife. Garza explained that he used it in his work, but it was an unusual knife for a person to be carrying (the knife used in the attacks was variously described as a linoleum, a carpenter's and a box-cutting knife) and it was moist and appeared to have been recently washed. Based on these facts there was probable cause for taking Garza into custody for the purpose of having him viewed by the victims of the assault.

Because of this conclusion we do not reach the defendant's contention that the evidence of the knife and his subsequent identification should have been suppressed because they were the products of an illegal arrest. We must, however, consider his contention that his identification in the hospital emergency room by Bernt and Koscielski was tainted because of the showup procedure used by the police.

■■ The practice of showing suspects singly to persons for the purpose of identification, and not as a part of a lineup, has been condemned. (*Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967.) Hospital showups per se cannot be considered to be so suggestive as to give rise to a substantial likelihood of misidentification. (*People v. Smith* (1974), 18 Ill. App. 3d 859, 310 N.E.2d 734.) Hospital showups have been upheld where the physical condition of the victim or witness makes a prompt hospital confrontation imperative or where the victim's excellent opportunity to view the defendant, during the commission of the crime, negates the likelihood of misidentification. (*People v. McCorry* (1972), 51 Ill. 2d 343, 282 N.E.2d 425.) The test to determine whether a particular showup constitutes a violation of due process of law depends on the totality of the circumstances surrounding it. *Stovall v. Denno.*

■■ Garza argues that hospital showups are allowed only when the witness is near death, and that the required exigent circumstances were not present in this case because neither Bernt nor Koscielski was about to die from their wounds. The fact that neither Bernt nor Koscielski died of his injuries does not diminish the gravity of the situation that confronted the police after they arrested Garza. They only knew that both boys appeared to be seriously injured. Bernt had been cut many times on his head and back; Koscielski had been slashed across the throat—a vital area. Their physical condition justified the police in bringing the suspect to the hospital for an immediate confrontation.

■■ Additionally, the hospital showup was warranted by the fact that both victims had an excellent opportunity to see Garza during the batteries. Although the street was somewhat dark, the window of the tuxedo shop was brightly lighted and the witnesses observed Garza in this light for two or three minutes. Bernt was face to face with Garza when the question was asked about the Gay Lords and when he was struck in the

eye. Koscielski watched him while he struck Bernt in the face and when he hit him over the head with a bottle. Koscielski also observed him as he himself was cut across the throat. The encounter provided both victims with such a good opportunity to view Garza that it furnished them an independent basis for their in-court identifications. We must, therefore, reject the defendant's contention that Bernt's and Koscielski's in-court identifications were the direct result of the hospital showups.

■■ Garza's last argument is that the lineup, at which he was identified by Tucker, was unduly suggestive. He points out that this lineup consisted of the four suspects and one other man and that this fifth man did not fit the description of the attackers since he had a goatee. He concludes from this that Tucker had no choice but to select him and the three other suspects.

All the participants in the lineup were approximately the same age, height and weight and were dressed in a similar fashion. There is no contention that the police made any suggestion or improper comment to Tucker before or during the lineup. More importantly, there is objective evidence that the lineup was not prejudicial. Tucker only identified Garza and two of the other three suspects. If Tucker had no choice as the defendant claims, he would have identified all four men.

Like Bernt and Koscielski, Tucker also had an adequate opportunity to observe Garza during the commission of the crimes. He first saw him and the others in the reflection of the window as they drove up in the automobile. He saw him as he got out of the car and when he asked if the three boys were "Gay Lords." He saw him as he attacked his two friends and was able to identify the knife used by him. This two- or three-minute observation at close quarters was sufficient to give Tucker's in-court identification an independent foundation.

The judgment is affirmed.

Affirmed.

MEJDA, P. J., and McNAMARA, J., concur.