THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOHN H. PAYTON, Defendant-Appellant.

Third District    No. 80-58

Opinion filed December 18, 1980.

Thomas E. Cowgill, of Cirricione, Block, Krockey & Cernugel, P. C., of Joliet, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

This is an appeal by the defendant John Payton from his conviction for robbery, following a bench trial. The defendant was sentenced to three years' probation with the first six months to be served in the county jail. The issues on this appeal center upon the court's failure to suppress incriminating statements made by Payton on the morning following the robbery and his arrest. The defense contends that his statements should have been suppressed as fruit of an illegal arrest, or as the product of duress.

The facts as found by the trial court, and as supported in the record,

indicate that around 12:30 a.m. in the early hours of May 30, 1979, four or five black men approached Steve Wagner from the rear as he walked on the streets of Joliet. Wagner, who had been at a nearby lounge, was walking home, portable radio in his hand. As the men approached, Wagner turned and then started to run. He tripped and fell, and the radio fell from his hand. Then the men began hitting and kicking him as he lay on the ground. The beating completed, the men took the radio and Wagner's wallet, and they fled from the scene. A police patrol arrived shortly thereafter to find Wagner lying on the ground. He told the officer who stopped that he had been attacked by four or five black men, who had beaten him and taken his radio. He informed the officer that one of the men wore a hat with a short bill turned backwards on his head. Because of the poor lighting he could not identify the clothing of his assailants or other characteristics. Wagner was taken to the hospital.

Within 10 minutes of the attack, Officer Pederson, who had first come upon Wagner, was driving his squad car within blocks of the scene of the crime. He noticed four black youths walking on the street. He also noticed that one of them was carrying a black object which could have been a briefcase or a portable radio. Another of the four was wearing a cap with the bill facing backwards. Shortly after Pederson noticed the group, the four men split up. Two of the men, the one carrying the object and the other with the cap, went into a nearby restaurant. The other two, including the defendant, stayed outside the restaurant. The officer, who had radioed for assistance, then exited his squad car and approached the two men outside the restaurant. They had started to walk up the street. Officer Pederson stopped them and informed them that he wanted to detain them to ask some questions about an investigation. He then left the defendant and the other man with another officer for a moment, while he went into the restaurant to talk with the other men. The two inside were in possession of the black object, believed to be a portable radio, and the small billed cap. After confirming that the object being carried was a portable radio, Officer Pederson placed all four men in a squad car to be taken to the police station. He went to the hospital for Wagner's identification of the radio. Wagner identified the radio as the one taken from him during the robbery.

At the station, the defendant Payton was given his *Miranda* rights, and at that time he told the officer that he did not want to talk with the police. He was then taken to a jail cell by the jailer. It was around 1 a.m. The next morning, about 10:30 a.m., another officer came to see Payton. Officer Gerdes informed Payton that he was assigned to investigate the case and that his information indicated that Payton was one of the robbers. As Gerdes began to again read Payton his rights, Payton told him "that the reason he lied to the other officer was he wanted to go to the

Marine Corps." Gerdes finished reading Payton the *Miranda* rights, after which the defendant agreed to talk with the officer. He then gave a statement implicating himself in the robbery.

■■ The defense argues that the statements should be suppressed because it was the fruit of an illegal arrest. It is argued that at the time Pederson stopped Payton he did not have probable cause to arrest and that an arrest was made when he first stopped him. The difficulty is with the latter contention, for the facts in the record indicate that Payton was only detained initially for investigation, not for purposes of arrest. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) It is established "that a police officer, in appropriate circumstances and in an appropriate manner, may approach an individual for purposes of investigating possible criminal behavior even though there is no probable cause to arrest, provided, however, that the officer's decision to stop is based on specific and articulable facts which, when combined with rational inferences from those facts, reasonably warrant the investigative intrusion." (*People v. Grice* (1980), 87 Ill. App. 3d 718, 722. See *People v. Ussery* (1974), 24 Ill. App. 3d 864, 321 N.E.2d 718; *People v. Fulton* (1979), 68 Ill. App. 3d 915, 386 N.E.2d 605. See also Ill. Rev. Stat. 1979, ch. 38, par. 107—14.) The facts in the case at bar, looked at cumulatively, indicate that Officer Pederson possessed sufficient information to warrant his investigative stop of the defendant and his companion. Four men had robbed Wagner of a radio and a wallet just minutes before Pederson saw the defendant and three others in the vicinity of the robbery. One of the four carried a black object, believed by Pederson to perhaps be the portable radio taken from Wagner. One of the four men who attacked Wagner wore a small billed cap, turned backwards on his head. One of the group, Pederson observed, wore a small billed cap, turned backwards on his head. Given the number of persons, their presence together in a group, their geographical and temporal proximity to the crime, and the fact that one wore a cap and another carried an object, both similar to the items possessed by the robbers, we conclude that Officer Pederson had a basis for making the investigative detention of defendant Payton and the others. *People v. Blakes* (1977), 55 Ill. App. 3d 654, 370 N.E.2d 869; *People v. Garza* (1976), 44 Ill. App. 3d 30, 357 N.E.2d 1264.

His initial detention for investigation was only brief, long enough for the officer to enter the restaurant to investigate the other two men. When he entered the restaurant he found the other two men and confirmed that the object being carried was a portable radio. After leaving the restaurant with the other two, Pederson then placed the four in a squad car to be taken to the station. At that time there was probable cause to arrest. Payton's arrest was not, as argued, guilt by association. The arrest was

justified by specific facts, including the possession of the radio, known to the officer, which when viewed cumulatively indicated that Payton was a member of the group which had, only minutes before, attacked and robbed Steve Wagner. That Pederson didn't question them on the scene does not indicate that his initial detention constituted an arrest. Once Pederson had confirmed that the object was a radio, he had probable cause to arrest. No questions were then proper until the men had been given their *Miranda* rights warnings. We find no error in the court's refusal to suppress the statement given as being the fruit of an illegal arrest.

■■ The second contention by the defense is that the statements should have been suppressed as the product of duress. The basis of this defense argument is that Payton's request to remain silent was not scrupulously honored by the police, in that another officer questioned him again the following morning concerning the robbery. Initially, we must note that the decision on the voluntariness of an incriminating statement is for the trial court to make. (*People v. Spataro* (1978), 67 Ill. App. 3d 69, 384 N.E.2d 553.) This court has had several recent occasions in which to discuss the requirement under *Michigan v. Mosley* (1975), 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313, that a defendant's right to remain silent be honored by the police. (*People v. Savory* (1980), 82 Ill. App. 3d 767, 403 N.E.2d 118; *People v. Robinson* (1980), 87 Ill. App. 3d 621, 410 N.E.2d 121; *People v. Pleasant* (1980), 88 Ill. App. 3d 984, 411 N.E.2d 132.) The approach utilized in these cases indicates that a determination of the issue must be made based upon all the facts concerning the defendant's custody, his exercise of his right to remain silent, and his subsequent decision to speak to the police. Consideration of a number of factors is required. As discussed in *People v. Pleasant* (1980), 88 Ill. App. 3d 984, 988:

> "Two of the most crucial are whether there was a significant period of time, during which there was a complete cessation of questioning, between the defendant's exercise of his right to remain silent and the reinterrogation, and whether the reinterrogation was preceded by a fresh set of *Miranda* warnings [citation]. 'Additional circumstances which tend to demonstrate that the defendant's right to remain silent was scrupulously honored are that a different officer conducted the second questioning and that a completely different subject matter was involved in the second questioning' [citation]. Most recently, in *People v. Savory*, [citation], this court found an additional factor tending to show the defendant's right to remain silent was not violated by the resumption of interrogation to be the presence of something in the record which would justify or explain the defendant's reconsideration of his decision to remain silent."

Further, as noted in *People v. Robinson* (1980), 87 Ill. App. 3d 621, 626, a defendant may be requestioned about the same crime as the original interrogation, so long as the record supports a conclusion that his *Miranda* rights were scrupulously honored. In the case at bar, the facts, as found by the trial court and as supported in the record, show that when the defendant initially refused to talk with police, his assertion of his right to remain silent was honored and questioning did not occur. Payton was taken to his jail cell for the night. He was not kept in an interrogating room. He was not kept from sleeping. He was not intentionally kept from seeing family, friends, or a lawyer who wished to see him. The record is devoid of any such facts.

The following morning, around 10:30 a.m., after Payton had been given a chance to rest, a different officer than the one who had given Payton his rights the night before came to see him. After informing him that he was investigating the robbery, this second officer began reading Payton his *Miranda* rights. Before the officer had finished that and before any questions were asked, Payton blurted out that he had not told the truth the night before to an officer. The officer conducting the investigation would not let Payton continue until after he had finished again informing him of his right to remain silent. After that had been done, the officer took Payton's statement. Thus, in the instant case, we have Payton's initial decision not to speak, which was honored by the police and he was allowed to go to his cell for the night. Then, the following morning, after a significant period of time, a different officer comes to investigate the robbery. Before beginning questioning, he again gives the defendant his *Miranda* rights warnings. Even before this is completed, Payton volunteers a statement. Before taking the defendant's statement, the officer makes sure that he finishes the recitation of rights to the defendant. The defense stresses that the defendant was only 18, with a 10th-grade education and no prior police contact. Yet, when the circumstances are examined and all factors considered, the record fully supports a determination that the police scrupulously honored Payton's initial decision to remain silent. The mere fact that reinterrogation was begun the following morning by a different officer does not establish that the police failed to honor Payton's rights, or that his statement was involuntarily given. In this case, there is no evidence that the confession was less than voluntary due to persistent and repeated efforts to wear down the defendant's resistance and make him change his mind. There is no evidence that his decision to talk with police the following morning was the product of police coercion or intimidation such as to require a conclusion that his statement was involuntary. We conclude that the trial court did not err in finding that the defendant John Payton's right to

remain silent was scrupulously honored by the police or in failing to suppress the defendant's incriminating statements.

We find no reversible error in the record in this case. Accordingly, the judgment of the Circuit Court of Will County is affirmed.

Affirmed.

STOUDER and BARRY, JJ., concur.