THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FRANKLIN JOHNSON, Defendant-Appellant.

First District (5th Division)    No. 79-1024

Opinion filed June 26, 1981.

Michael P. Seng and Edward B. Arnolds, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Pamela L. Gray, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendant was indicted for rape, deviate sexual assault, burglary with intent to commit rape, burglary with intent to commit robbery, and robbery. (Ill. Rev. Stat. 1977, ch. 38, pars. 11—1, 11—3, 19—1 and 18—1.) A jury found him guilty of all charges except for burglary with intent to commit robbery and defendant was sentenced to a term of 50 to 100 years. On appeal, defendant contends that: (1) the prosecutor improperly influenced the grand jury to secure an indictment; (2) he was illegally stopped prior to his arrest; (3) his showup and lineup were unnecessarily suggestive; (4) other crimes evidence was improperly admitted; (5) he was prevented from testifying by the erroneous ruling that his prior convictions could be used as impeachment; (6) expert testimony concerning identifications was improperly excluded; and (7) he was not proved guilty beyond a reasonable doubt and the trial court's erroneous rulings denied him a fair trial.

The instant attack occurred between 9:30 and 9:50 a.m. on July 14, 1977, in the victim's apartment in Evanston. The victim was also robbed of $10. After the attack she phoned the police. Defendant was arrested at

about 10 a.m. on the same day. He was taken back to the vicinity of the victim's apartment and required to stand in the street while the victim observed him from her second-floor window. Later he appeared in several lineups at the Evanston police station.

Defendant made pretrial motions to: (1) suppress evidence of his prior convictions; (2) suppress identification testimony; (3) quash his arrest; (4) quash his indictments; and (5) suppress other crimes evidence. Evidence of a prior robbery conviction was excluded from impeachment, but all of the other motions were denied.

The following pertinent evidence regarding defendant's arrest appears from the record. Defendant was stopped while driving his red Volkswagen. The Evanston police had been investigating several rapes which had occurred before the instant one in which the rapist had been described as a black man in his thirties, of stocky build, about 6 feet tall, weighing about 200 to 230 pounds, with balding or closely-cropped hair, wearing a T-shirt and painter's pants. His car had been described as a "small red sports car" and a red Volkswagen. At 9:50 a.m. on the day of the instant rape the arresting officer received a call informing him that a rape had just taken place and was assigned a street corner to watch. The attacker was described as a black male, heavy build and closely-cropped hair. En route to the corner he observed a red Volkswagen driven by a heavy-set black male wearing a white T-shirt. He stopped the car and told defendant that he was investigating a rape. When defendant stepped out of the car the officer saw that he was wearing paint-stained khaki pants. He received a further description of the attacker in the instant rape over the police radio as being a black male, 5'11" or 6' tall, 200 to 225 pounds, with closely-cropped or balding hair, moustache, and wearing paint-stained khaki pants. The officer handcuffed defendant and brought him to the address of the rape where defendant stood in the street while the victim identified him from her window. The officer admitted that he had stopped other black males in red Volkswagens before the instant arrest and that at the time of the instant stop he had no reason to believe that a red Volkswagen was involved in this rape. He also stated that he had decided to hold defendant before he had received the second radio broadcast. Following argument, the motion to quash the arrest was denied.

The following pertinent evidence was adduced at the hearing to suppress identification. After defendant's arrest he was taken to the address of the victim's apartment and stood handcuffed first in the middle of the street and then about 10 to 15 feet from the building. The victim was asked to look at someone from her apartment window. She saw a black man with a uniformed policeman. Although the man who had raped her wore a bandana on his head, the man in the street did not. She

identified the man as the person who raped her. Defendant was told to get back in the squad car after the identification.

Later defendant appeared in a series of lineups at the police station in which he was the only man with a bald head, with the possible exception of one other, or a beard. An attorney who witnessed the lineups on defendant's behalf stated that a victim of a previous rape viewed a lineup and stated that her attacker looked like another man but sounded like defendant. After the first lineup the attorney asked that the order of the participants be changed but was told that he was only there to observe. The woman later viewed a second lineup and identified defendant as her attacker. The victim of the instant rape also identified defendant as her attacker. Following argument, the motion to suppress identification was denied.

The pertinent evidence at trial showed the following. The victim testified that she was returning to her apartment from the store at about 9:30 a.m. on July 14, 1977. She entered the outer door and was unlocking the security door when she saw a black male about 6 feet tall, weighing about 220 pounds, with a slight beard and wearing a bandana around his head, a white T-shirt and khaki pants. She thought that she recognized him, said hello, and held the door. He nodded as if to acknowledge her hello, and she walked up the stairs to her apartment. She identified defendant as the man who entered the building. As she ascended the stairs, she glanced back two times and saw that defendant was following her. As she entered her apartment, she felt a hand cover her mouth and a voice said, "Just shut up and I won't hurt you." He also asked if anyone was in the apartment, and she falsely answered that her son was there.

She was able to free herself from his grasp and attempted to escape through the back door but defendant caught her. She was about a foot from the defendant and facing him when he wrapped a kitchen towel around her head. Despite defendant's warnings, she tried to push the towel up so she could see him. She entered the dining room where she screamed and struggled with defendant. He threatened her with a hammer that he took from the table and told her to stop screaming. Defendant told her that he would not hurt her but also that he was going to rape her. The victim continued to push the towel up despite defendant's warnings and was able to see his face.

Defendant told her to undress in her son's bedroom and he did the same. As he did so she noticed that he was not wearing undershorts. He told her to lie on the bed and performed a deviate sexual act upon her for 10 or 15 seconds during which time she could again see him. Defendant then had intercourse with the victim and specifically instructed her to put her legs around his back, to rub his chest with her hands and to kiss his lips. As she kissed him she could see his chin, lips and nose. Defendant

then dressed himself, left the bedroom and returned with a rope and tied her hands. He told her to be quiet and left the room. When he returned he saw that she had loosened the rope and so he tightened it and tied her ankles with her blouse. She was able to see him as he tied her ankles. He again left the room and she could hear her keys jingling, one set of which she had left in her purse, and then the door close. She freed herself, locked the front door and called the police at about 9:50 a.m.

She testified concerning the circumstances of her initial identification of defendant from her window and the subsequent identification at a lineup. She was later treated at a hospital.

The victim identified the panties and blouse which she wore at the time of the rape and the pants that defendant was wearing. She also stated that a $10 bill which she had gotten that morning was missing from her purse after the attack. The victim testified that the lighting conditions in her apartment were good during the attack. She also stated that she wore glasses to correct her near-sightedness but was not wearing them at the time of the attack because they had been knocked off when defendant first grabbed her.

The examining physician at the hospital testified that the victim was very upset and trembling when he first saw her. She had a bruise on her cheek, a scratch on her shoulder and several on her lip as well as other marks of violence. Examination of a vaginal washing revealed the presence of sperm.

A forensic chemist testified that his examination of the victim's vaginal washing revealed the presence of sperm. He also tested the crotches of the victim's panties and defendant's pants and found the presence of seminal fluid.

Evidence of another rape was admitted to show defendant's common scheme or plan. The 15-year-old victim described the circumstances of her rape which occurred at about 2:30 p.m. on July 6, 1977, in Evanston while she was babysitting a 3-year-old child at an apartment building. On her way into the building she almost bumped into a black man who was about 6 feet tall, large and muscular, weighed about 200 pounds, had short cropped hair, and wore painter's pants with paint splotches on them, a red and blue shirt with thin white lines, tinted sunglasses, a western-style bandana around his head, and carried an orange hand towel. She identified defendant as that man. She took the child up the back stairs, entered the back door and latched the screen door. After putting the child in her bedroom, she went into the living room where she encountered defendant. He approached the victim holding the orange towel and told her to say nothing. He told her to put the towel over her face and go into the bedroom which she did. Defendant asked something about "the little girl" and victim told him that she was in her bedroom. When defendant

walked into the living room, the victim removed the towel and began screaming. Defendant returned, choked her and told her that he could break her neck. Pursuant to defendant's instructions, she rolled over and was able to see him since the towel had fallen from her eyes. He told her to replace the towel and to remove her pants which she did. Defendant inquired when her husband would be home and she told him that she was a 15-year-old babysitter and that the owners would return in 15 or 20 minutes. Defendant performed a deviate sexual act upon her and then an act of intercourse. During intercourse defendant told her to get her legs higher and to place her hands on his chest. Following the act defendant tied her ankles with a scarf he took from a dresser. He went into the kitchen where he rummaged around and then left. The victim freed herself, locked the back door and called the police.

She later viewed a lineup in which she saw a man who looked like her assailant and another who sounded like him. She saw the lineup a second time, and identified defendant as her attacker.

Foster Taylor, an employee of a car dealership located about a block west of the building in which the babysitter was raped, testified that at about 3 p.m. on July 6, 1977, he was in the alley at work and saw defendant removing his pants which appeared to be a painter's uniform. Defendant was wearing a sweat band, white overalls, a white T-shirt and blue pants under his other pants. He left in a red Volkswagen at about 60 miles per hour and nearly ran over Taylor. He identified defendant at a lineup on July 14, 1977.

The defense intoduced testimony of a co-employee of Taylor which showed that Taylor was untrustworthy. In an *in camera* hearing, defendant offered the testimony of Dr. Buckhout, an expert in eyewitness identifications. The trial court excluded the testimony because it would invade the province of the jury, be confusing, and not resolve any of the issues involved.

An attorney present at the lineup viewed by the babysitter described the circumstances of the lineup consistently with his pretrial testimony. He also stated that before the lineup defendant had shown him an Ace bandage he was wearing on his knee.

The defense also called a police officer who testified that when he interviewed the instant victim she told him that when she first saw defendant she thought he looked familiar. Defendant's wife testified that she had had sex with defendant in the early morning hours of July 13, 1977, after which he put on the khaki pants in question. Defendant also introduced several witnesses who testified that his reputation for being peaceful and law abiding was good. In addition, although a fingerprint was recovered from the check book in the victim's purse, it was shown not to be defendant's.

The jury found defendant guilty on all counts except for burglary with intent to commit robbery, and he now appeals.

OPINION

I

Defendant contends that the prosecutor improperly influenced the grand jury to secure an indictment against him. The facts pertinent to this contention are as follows. On July 15, 1977, the grand jury returned a true bill against defendant for rape and robbery. On August 18, 1977, the transcript of the July 15, 1977, proceeding was read to a second grand jury, and in addition, an Evanston police employee testified concerning a conversation she had with the victim in which she described the deviate sexual act which defendant performed upon her. The second grand jury returned true bills for rape, deviate sexual assault, burglary with intent to commit rape, and burglary with intent to commit robbery and robbery.

Defendant contends that the indictments returned by the second grand jury were improperly influenced and prejudiced by the prosecutor's expression of his opinion that the defendant had committed the crimes. After the July 15 grand jury had returned true bills for rape and robbery, a juror asked why the robbery charge had been included. The prosecutor replied, "We wanted to include every offense that this man committed. No sense in forgetting about something when he committed the crime." The statement was reread to the August 18 grand jury as part of the transcript.

Defendant argues that the prosecutor's response was improper because he uncategorically stated that defendant had committed the crimes for which the indictments were sought. We do not agree. The comment by the prosecutor was made during the July 15 proceeding after a true bill had been returned and could not have influenced the grand jurors' decision. The fact that the statement was reread to the August 18 grand jury does not constitute misconduct on the part of the prosecutor. It was obvious to the later grand jury that a transcript was being read and it would be aware of the context of the remarks being made after the return of a true bill. In addition, a review of the record reveals that the prosecutor's remarks were not directed at convincing the grand jury that defendant was personally guilty of the crimes but that whoever had committed the other offenses had also committed the robbery and should be indicted for that offense also. We therefore find that the prosecutor did not express his opinion of defendant's guilt and was not guilty of any misconduct in that regard.

During the August 18 proceeding, the police employee was asked whether the hammer with which defendant threatened the victim had been analyzed for fingerprints to which the employee responded, "I have

no idea of that." A grand juror also asked if the victim had been taken to a hospital and whether a sperm test had been performed. The police employee replied that she did not have any information regarding the results of any tests. The prosecutor was asked by a grand juror if he had that information and he replied that his file, which was compiled on the date of the rape, indicated that tests were performed but that he did not believe that the results had come back at that time. Later, the prosecutor was asked why he did not bring in the medical reports. He replied, "I did not think there would be any questions on the medical reports."

A grand juror also questioned the prosecutor about the circumstances of defendant's arrest. The prosecutor explained that defendant had been stopped after the rape because of a series of rapes committed by a man fitting defendant's description and driving a reddish-orange Volkswagen.

■■■ Defendant contends that the State's responses to the grand jurors' questions about fingerprints, the sperm tests, and other medical records were improper. He asserts that in response to direct questions about each item the grand jurors should have been informed that they could subpoena further witnesses or obtain such tests and that the prosecutor's response misled the grand jury and diverted its attention from the lack of evidence. We do not agree with this contention for several reasons. Regarding the question of whether the hammer had been subjected to fingerprints, the police employee simply stated she had no knowledge of any such test. The same is true of her response to the question regarding the result of any sperm tests. A frank admission of ignorance can hardly be considered misleading. There was no duty to present all of the incriminating evidence shown by whatever tests may have been taken or to inform the grand jury of its existence. (*People v. Creque* (1978), 72 Ill. 2d 515, 382 N.E.2d 793.) If the grand jury did not find the evidence sufficient in the absence of such evidence, it would not have voted a true bill. The questions were isolated inquiries and did not alter the fact that the evidence presented was sufficient for a finding of probable cause.

■■ Defendant also contends that the prosecutor's statement that he did not bring the medical reports because he did not feel that there would be any questions about them diverted the grand jury's attention from the lack of evidence and suggested that the evidence was sufficiently clear without medical tests or medical testimony. We agree with the State that the response can only be considered an honest response to the question posed by the grand jury. As he informed the grand jury, the prosecutor's file had not been updated since the day of the attack. If the grand jury felt that the evidence was insufficient to sustain the charges in the absence of medical tests, it would not have returned a true bill. The lack of fingerprint or medical evidence obviously did not weigh heavily in the grand jurors' minds. Defendant may not challenge the indictments on the

ground that they were not supported by adequate evidence. *People v. Creque.*

■■ Finally, defendant contends that the prosecutor's comments regarding the circumstances of his arrest and the Volkswagen's involvement in other rapes were misleading in that they suggested defendant's guilt by reason of the other rapes and in fact a red Volkswagen had been reported in only one other rape. Although the red Volkswagen had been only reported specifically in one other rape, another victim had described her assailant's car as a red sports car. The prosecutor's comment that the car had been reported in other rapes was not unfounded because inferentially the red sports car was in fact the red Volkswagen. In addition, while the mention of the report of a red Volkswagen in the other rapes may suggest defendant's involvement in those rapes, it was still the basis for defendant's initial step and was an honest response to the grand juror's question. This information was necessary to connect defendant's stop to his involvement in this rape. The lack of this information would have left the grand jury without knowledge of the full circumstances surrounding defendant's stop and arrest. The information did not mislead the jury into thinking that defendant was guilty of the instant rape because he was stopped in a car which was similar to the car involved in other rapes but merely provided the grand jury with the justification for his stop. No impropriety existed in the grand jury proceeding, and we find this contention to be without merit.

## II

Defendant contends that the arresting officer lacked sufficient grounds for the initial stop of defendant's vehicle after the instant crimes and that his subsequent identification must be suppressed as a result of the illegal stop.

■■ A police officer may, in appropriate circumstances and in an appropriate manner, approach an individual for purposes of investigating possible criminal behavior even though there is no probable cause to arrest, provided that the officer's decision to stop is based on specific and articulable facts which, when combined with rational inferences from those facts, reasonably warrant the investigative intrusion. (*People v. Payton* (1980), 91 Ill. App. 3d 78, 414 N.E.2d 283; *People v. Grice* (1980), 87 Ill. App. 3d 718, 410 N.E.2d 209.) The officer must have knowledge of sufficient facts at the time of the encounter to create a reasonable suspicion that the person in question has committed, or is about to commit, a crime. *People v. Smithers* (1980), 83 Ill. 2d 430, 415 N.E.2d 327; see Ill. Rev. Stat. 1977, ch. 38, par. 107—14.

■■ Contrary to defendant's suggestion that he was stopped solely because he was a black man driving a red Volkswagen about 30 minutes

after the rape, the record reveals that the officer had sufficient information to warrant defendant's investigative stop. Prior to his stop of defendant, the officer was aware that a series of rapes had occurred in Evanston from April 9 to July 14, 1977, the date of the instant attack. The rape suspect had been described as a black male, heavy build, 5′10″ to 6′ tall, weighing 200 to 220 pounds, with close-cropped or balding hair, wearing paint-stained pants, and driving either a red sports car or a red Volkswagen. At 9:50 a.m. on the day of the instant rape he received a radio call informing him that a black male, heavy build with closely-cropped hair had just committed a rape and was assigned a corner to watch. On his way to the corner he saw a red Volkswagen driven by a person who matched the description of the attacker in the previous rapes. As the car passed the squad car, the officer observed a heavy-set black male wearing a white T-shirt. Based on the specific descriptions of the rapist and his car by the prior victims, the radio call that a rape had just been committed between five and ten minutes previously in the general geographical proximity by a heavy-set black male, and observing that a person who fit the general description of the instant rapist and driving a car matching the description of one driven by the suspected rapist in a series of rapes in the area, and drawing reasonable inferences from this information, we find there were sufficient facts to create a reasonable suspicion that defendant was involved in the instant rape. The officer's action in stopping defendant in order to investigate further was warranted especially since the officer would be expected to act quickly in order to maintain the status quo. (*People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1624; *People v. Herron* (1980), 89 Ill. App. 3d 1048, 412 N.E.2d 1365.) The trial court's decision was not manifestly erroneous in this regard and must be affirmed. *People v. Herron.*

When defendant had been stopped and stepped out of the car the officer could see he was wearing paint-stained khaki pants. When the officer received the further description of the attacker which specified he was wearing paint-stained khaki pants and the officer could see that defendant fit this description, probable cause clearly existed for defendant's arrest.

We therefore find that the investigative stop and subsequent arrest of defendant were proper.

### III

Defendant contends that the showup at the scene of the crimes and the later lineup in which he was identified were unnecessarily suggestive and that the resulting identifications should have been suppressed.

While one-man showups are not favored, they are justified in various

circumstances including where the witness had an excellent opportunity to observe the defendant during the commission of the crime, and prompt identification was necessary for the police to determine whether or not to continue their search. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) In the instant case the victim had an excellent opportunity to view her attacker on several occasions. She saw him as she entered her building and twice as she walked to her apartment. She was able to see him in her kitchen when he put the towel on her face and afterwards she could see his face when she pushed the towel up despite his warnings. She could see him for 10 or 15 seconds during the deviate sexual act, and again as she kissed him. Later she could see him as he bound her ankles. Contrary to defendant's suggestion that she did not have an adequate opportunity to observe him and that any observation was inaccurate, the record shows that she had several occasions to see defendant and an excellent opportunity to do so.

■■ Defendant also contends that the State failed to show the necessity for a showup which took place more than 30 minutes after the rape, especially when lineups were promptly arranged. In fact, the defendant's arrest took place about 10 minutes after he left the victim's apartment and he was taken directly to the victim for the identification. We find that this is precisely the type of case where a prompt identification is necessary so that the police can determine whether or not to continue their search. The instant attack took place about 15 minutes before the showup. It was possible that the attacker was still in the area and could be found if the police continued their search promptly if defendant could not be identified by the victim. Considering the series of previous rapes, it would be especially important that the police determine whether the suspect could be identified or whether they should continue their search. To delay the identification in such a case until a lineup could be held would seriously impede an effective police investigation. The showup was justified under these circumstances.

Defendant also suggests that the showup was not an "on-the-scene" identification to determine if the suspect should be taken into custody since defendant was already in custody. The procedure used here is indistinguishable from the on-the-scene identification in *Manion*. There the suspect was held by police in a nearby place until the witnesses could view him for identification purposes. The showup took place about 15 minutes after the crime, and the defendant contended that no exigent circumstances necessitated the showup since he was already in custody. The fact that the suspect is in custody does not lessen the need for a prompt determination by the police of whether they had found the right person or whether they should continue the search, which is the justifica-

tion for the showup procedure. The same is true in the instant case, and the on-the-scene identification was proper.

Defendant also contends that the suggestive showup made it inevitable that the victim would re-identify defendant at the lineup. As already discussed, the victim had an excellent opportunity to identify defendant, and any suggestiveness in the showup procedure is overcome by the reliability of the identification under the totality of the circumstances. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) Defendant also contends that he stood out in the lineup because he was the only man with a bald head and a beard. Whether or not he was the only bald person in the lineup does not invalidate the victim's identification since when she saw him during the attack he was wearing a bandana on his head and she would not know whether or not he was bald.

We therefore find that the showup procedure was justified and that the victim's identifications were reliable and not the product of suggestiveness. The trial court did not err in denying defendant's motion to suppress the identification testimony.

## IV

■■ Defendant contends that he was unduly prejudiced by evidence of the separate and unrelated rape of the 15-year-old victim. Evidence of extra-indictment offenses is inadmissible unless it is relevant to show motive, intent, identity, absence of mistake or *modus operandi*. (*People v. Lindren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238; *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) Although defendant contends that the evidence of the two crimes reveals nothing that is not common to any rape, a review of the trial evidence shows sufficient similarities between the two attacks to justify admission of the evidence of the rape of the 15-year-old under the common scheme and design exception.

In the instant case, the geographical proximity of the attacks (approximately four blocks), the temporal proximity (eight days), and the similarities in the description of the attacker's attire and circumstances of the assaults, in addition to his instructions to the victims on how to position their bodies during the rapes, the acts performed upon the victims, and the manner in which each was confined after the attack by an article of clothing tied to the ankles, leaves little doubt that one man committed both crimes. The similarities between the two attacks was sufficient to allow admission of the July 6 attack to show a common scheme or design in the instant case. *People v. Walls* (1980), 87 Ill. App. 3d 256, 265, 408 N.E.2d 1056, 1064; *People v. Gonzales* (1978), 60 Ill. App. 3d 980, 992, 377 N.E.2d 91, 100.

Defendant also argues that even if the evidence of the prior rape

were to be considered properly admitted under the common scheme exception, the evidence was so prejudicial that it should have been excluded. Whether the prejudicial effect of the evidence outweighs the probative value is a decision left to the discretion of the trial court. (*People v. Gonzales; People v. Rogers* (1975), 31 Ill. App. 3d 981, 335 N.E.2d 48.) After reviewing the instant record, we cannot say that the trial court abused its discretion in admitting the evidence of the earlier rape.

## V

Defendant contends that he was prevented from testifying at trial by the trial court's erroneous ruling that his prior convictions were admissible for purposes of impeachment at trial. Prior to trial defendant made a motion to suppress evidence of his prior convictions. The record reveals that defendant had been previously convicted of four robberies and a rape. He had been sentenced to 30 to 60 years on three of the robberies and the rape and was released from custody on March 5, 1974. In support of his motion to suppress evidence of his prior convictions, defendant introduced the testimony of several fellow church members and employers to the effect that defendant's reputation in the community for truth and veracity was good. The trial court ruled that evidence of defendant's earliest robbery conviction would be suppressed but that evidence of the other convictions could be introduced at trial for impeachment purposes.

There is no doubt that defendant's convictions satisfied the requirements set forth in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, since they were all punishable by imprisonment in excess of one year and defendant was released from confinement within ten years of trial. Defendant contends that the trial court abused its discretion in ruling that the convictions were admissible since rape is a crime of violence and has little bearing on a witness' credibility. In addition, defendant argues that the evidence of the prior convictions was especially prejudicial because the convictions were for the same crimes for which he was on trial. Defendant argues that the trial court failed to properly weigh the probative value of the evidence of his prior convictions against the extent to which defendant's testimony would have served the search for truth, and thereby denied his right to testify at trial.

■■ As this court noted in *People v. Hovanec* (1979), 76 Ill. App. 3d 401, 421, 394 N.E.2d 1340, 1355, all felonies are subject matter for impeachment, are presumed to reflect on a witness' credibility, and are admissible at trial unless their probative value is substantially outweighed by their prejudicial effect. Although defendant's prior convictions were for a rape and robberies, there is no evidence in the record that the trial court ruled that they were admissible to show his propensity to commit such crimes but rather to allow the jury to properly assess defendant's credibility. In

light of defendant's offer of reputation testimony concerning his exemplary character, evidence of his prior convictions would have assisted the jury in assessing his credibility as a witness if he had chosen to testify. We therefore find that the trial court did not abuse its discretion in ruling that defendant's prior convictions were admissible for impeachment purposes should defendant decide to testify.

In view of the propriety of the trial court's ruling on the admissibility of defendant's prior convictions, we cannot agree that defendant was denied his right to testify at trial but conclude that his decision not to testify was a matter of trial strategy. (*People v. Leonard* (1980), 83 Ill. 2d 411, 423, 415 N.E.2d 358, 364; *People v. Hovanec* (1979), 76 Ill. App. 3d 401, 422, 394 N.E.2d 1340, 1355.) We therefore find no merit to defendant's contention.

## VI

Defendant next contends that the trial court erred in excluding the expert testimony of Dr. Buckhout on the question of the weight to be given to the victim's eyewitness identification of the defendant. He contends that the expert testimony would have explained the various factors which affect the accuracy of eyewitness identification and would have been helpful to the jury in assessing the identification in the instant case.

■■■ Expert testimony is generally admissible at trial when the subject matter of inquiry is sufficiently beyond the common experience of an average juror and is one in which only persons of skill and experience in the area are capable of forming a correct judgment regarding a connected fact. (*People v. Dixon* (1980), 87 Ill. App. 3d 814, 410 N.E.2d 252; *People v. French* (1978), 59 Ill. App. 3d 353, 375 N.E.2d 502.) Expert opinions may not be admitted on matters of common knowledge unless the subject is difficult in comprehension and explanation. (*Hernandez v. Power Construction Co.* (1978), 73 Ill. 2d 90, 99, 382 N.E.2d 1201, 1205.) *People v. Dixon* presented the nearly identical question of whether cross-racial identifications, as is involved here, are of questionable reliability so as to allow the introduction of expert testimony on the subject to show their inherent unreliability. There, the court held that the question of the trustworthiness of an eyewitness identification is not beyond the common knowledge and experience of the average juror so as to be a proper subject for expert testimony. We agree with the court's observations in the *Dixon* case and hold that the exclusion of Dr. Buckhout's testimony was not error. The question of the accuracy of defendant's identification was a subject for cross-examination of the victim and closing argument and was fully explored by defendant's attorney at trial. We therefore find that the trial court did not err in excluding Dr. Buckhout's testimony.

## VII

Defendant also contends that he was not proved guilty beyond a reasonable doubt and that he was denied a fair trial by the trial court's various rulings. As already discussed, no error was committed by the trial court in its rulings on the various evidentiary matters presented. We therefore confine our consideration of this issue to the sufficiency of the evidence of defendant's guilt presented to the jury.

Defendant contends that the only direct proof connecting him to the instant offenses was the victim's testimony which was secured under suggestive circumstances and was doubtful.

> "[W]here the identification of the accused is at issue, the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused, provided the witness is credible and he viewed the accused under such circumstances as would permit a positive identification to be made." (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, 1320, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.)

As we have already discussed, the victim of the instant rape viewed defendant under circumstances which would permit a positive identification to be made and her testimony was clear and consistent regarding her identification and the circumstances of the attack. A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses and will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion.*) We find that the evidence fully supported the jury's verdict and accordingly defendant's convictions are affirmed.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.