THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
KEVIN BROWNSON, Defendant-Appellant.

Second District    No. 80-952

Opinion filed February 3, 1982.

Mary Robinson and Manuel S. Serritos, both of State Appellate Defender's Office, of Elgin, for appellant.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Barbara A. Preiner, Assistant State's Attorney, of counsel), for the People.

JUSTICE NASH delivered the opinion of the court:
Following a bench trial, defendant Kevin Brownson was convicted of rape (Ill. Rev. Stat. 1979, ch. 38, par. 11—1) and thereafter sentenced to six years imprisonment. He appeals, contending the trial court erred in failing to suppress his confession as involuntary and the fruit of an illegal detention, and that he was not proved guilty beyond a reasonable doubt. We affirm.

In the early morning hours of July 23, 1977, Molly _____ was asleep in her apartment at the West Chicago Lorlyn apartment complex in West Chicago, Illinois. She was awakened at approximately 2:30 a.m. by the presence of a male intruder who knocked her to the floor. Although it was dark within the apartment, some light filtered through the

drapes. The intruder got on top of her and held her arms; he told her he would not hurt her but would kill her if she screamed. She was unable to breathe and managed to let the intruder know she wouldn't fight or scream if he would allow her breath. He stood up and ordered her to undress him. She noted he wore a short-sleeved, striped rugby shirt and zippered ankle boots, was fairly heavy with a large stomach and fleshy chest and had a mole the size of a dime upon his upper left chest. Although the victim did not look directly at the intruder's face, she had the impression he was three to four inches taller than she with dark wavy hair. He then removed her night clothes and directed her to put on a pair of pantyhose. He obtained scissors from the kitchen, blindfolded her and cut the crotch out of the hose as she wore them. He forced her to perform oral sex and had intercourse with her while she wore the hose, calling her Molly during the act. Afterwards, he violently ripped the hose from her body and said she would now have to die. The intruder then tore out the telephone, bound and gagged her and left the apartment. She heard the sound of a key turning the lock in her front door after he closed it. She was tied so tightly she had to struggle to breathe, but finally managed to free herself. She then drove to a friend's home for help and thereafter to Central Du Page Hospital for an examination.

West Chicago police were informed of the rape and detectives George Hollow and Peter Dakuras obtained a list of residents and employees of the West Chicago Lorlyn apartment complex. They learned defendant worked there on an irregular basis as a maintenance man and painter. He had a pass key, had painted an apartment in the victim's building within the last month and had a large mole on his left chest noted by other employees. The detectives visited defendant at his place of employment at the Batavia Lorlyn apartments on August 3, 1977, at 11:30 a.m. and requested that he accompany them to the station stating they had a matter to discuss with him. Defendant advised them he first had to obtain permission to leave from his supervisor and, having obtained it, agreed to accompany the officers. In their car the detectives verbally gave defendant *Miranda* warnings and did so again in written form at the station where defendant signed a waiver of rights form. He was questioned about the rape for 1½ to 2 hours and denied any knowledge of the offense. When the officers asked if he had any marks, moles or tattoos defendant replied he did not, whereupon they asked him to remove his shirt and observed a dime sized mole on his left chest. Photographs and fingerprints were taken of defendant and an appointment made for him to take a polygraph examination. He was then driven back to work. Later that day he telephoned the police and informed them he would not submit to the polygraph on advice of counsel. The following day, however, defendant came voluntarily to the station accompanied by his father

who had advised him to submit to the polygraph to clear the matter up. While the time frame is in dispute, defendant apparently appeared at the station between 4 p.m. and 4:30 p.m. and waited approximately one-half hour for the polygraph examiner, Steven Theodore, to arrive. He then submitted to the test, which took about one hour, and Theodore told the officers there were signs of deception in the results. Defendant was then questioned until 6:55 p.m., at which time he admitted his guilt, telling his father he did it but did not know why. He then handwrote and signed a confession and telephoned an attorney in the presence of the officers, saying, "I want you to represent me" and "I did it."

After his indictment, defendant filed a motion to suppress his confession which the trial court considered at a number of hearings over a three-year period before it was denied.

In trial the victim, while unable to identify defendant as the rapist, did testify as to his height, build, hair, clothes, mole and the requirement of the rapist that she wear crotchless pantyhose.

Defendant contends his confession was involuntary and should have been suppressed. He asserts that Officers Hollow and Dakuras used coercion, promises and intimidation upon him during questioning, causing his will to be overborne so that he falsely confessed. Defendant states the police used knowledge of his past suicide attempt and his breakup with his fiancée, whose name was also Molly, six days before the rape to improperly play upon his emotions and cause him to become confused and upset. He maintains the questioning was intensive and he was promised medical care, told he was mentally sick, had just blacked out and that he would not go to jail if he admitted guilt. Defendant states he requested an attorney during questioning, but one was denied. He asserts he was subjected to a three-hour interrogation which delved into private areas of his life, including his sex habits, past marital discord and prior emotional instability, all while denying defendant an attorney, thereby overcoming his will.

When the voluntary nature of a confession is called into question by a motion to suppress the State has the burden of proving the statement was voluntarily given by producing all material witnesses to it or explaining their absence. (*People v. Lopez* (1981), 93 Ill. App. 3d 152, 416 N.E.2d 1127.) Whether a statement is voluntarily given depends upon the totality of the circumstances; that it was freely and voluntarily given without compulsion or inducement of any sort and that defendant's will was not overcome at the time he confessed. (*People v. Williams* (1981), 94 Ill. App. 3d 241, 418 N.E.2d 840; *People v. Boyd* (1980), 88 Ill. App. 3d 825, 410 N.E.2d 931.) Factors to consider include the intensity of the interrogation, failure to warn of constitutional rights and defendant's age, experience and education. (*People v. Lopez* (1981), 93 Ill. App. 3d 152, 416

N.E.2d 1127.) In making its determination, the trial court is not required to be convinced beyond a reasonable doubt but only by a preponderance of the evidence (*People v. Alvarez* (1981), 93 Ill. App. 3d 111, 416 N.E.2d 1217; *People v. Lopez* (1981), 93 Ill. App. 3d 152, 416 N.E.2d 1127), and such determination will not be disturbed on review unless contrary to the manifest weight of the evidence. *People v. Fuller* (1980), 91 Ill. App. 3d 922, 415 N.E.2d 502; *People v. Smith* (1980), 91 Ill. App. 3d 438, 414 N.E.2d 1281.

There is no evidence of record to sustain defendant's contention his confession was forced from him other than his assertion to that effect. He admitted he agreed to cooperate with the officers and did not request that questioning cease; the prosecution witnesses testified defendant did not request an attorney at any time. Defendant acknowledges he came to the police station on August 4 contrary to his attorney's advice. The record essentially discloses the officers merely confronted defendant with the evidence. He was not physically restrained or threatened, and questioning was limited to approximately 1½ to 2 hours on each day. Both officers denied making any promises or threats to defendant. It is the function of the trier of fact to resolve disputed fact questions (*People v. Sellars* (1981), 93 Ill. App. 3d 744, 417 N.E.2d 877), and the voluntariness of his confession was, in the first instance, for the circuit court. *People v. Payton* (1980), 91 Ill. App. 3d 78, 414 N.E.2d 283; *People v. Koesterer* (1976), 44 Ill. App. 3d 468, 358 N.E.2d 295, *appeal denied* (1977), 65 Ill. 2d 583.

The trial judge noted defendant had voluntarily come to the police station, he could have left at any time, he was given his *Miranda* warnings on four occasions and he freely and understandingly signed the waiver of rights form. The judge found defendant to be an articulate 24-year-old man with three years of college, some military experience and police training, and, based upon the totality of the circumstances, concluded the confession was voluntary. We cannot say this decision was against the manifest weight of the evidence. *People v. Smith* (1981), 93 Ill. App. 3d 1133, 418 N.E.2d 172.

Defendant next argues that his confession of August 4, even if voluntary, was the poison fruit of an illegal custodial detention of him on August 3, unattenuated by intervening circumstances sufficient to remove the taint and, therefore, should have been suppressed.

■■ ■ Custodial interrogation as defined in *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 16 L. Ed. 2d 694, 707, 86 S. Ct. 1602, 1612, consists of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Defendant maintains he was in custody and went to the station on August 3 *as he felt he had to* and not merely in response to a police request. He cites *Dunaway v. New York* (1979), 442 U.S. 200, 60 L.

Ed. 2d 824, 99 S. Ct. 2248, and its Illinois progeny (*People v. Townes* (1981), 94 Ill. App. 3d 850, 419 N.E.2d 604; *People v. McMahon* (1980), 83 Ill. App. 3d 137, 403 N.E.2d 781; *People v. Dowdell* (1980), 81 Ill. App. 3d 266, 401 N.E.2d 295), for the proposition that he was in fact illegally restrained by police on August 3 and in custody, asserting he was picked up without a warrant or sufficient probable cause to obtain one; transported by police to the station for questioning in their vehicle; and, not informed he was free to leave although he was not formally arrested until after he confessed on August 4.

In *McMahon* and *Dowdell* a key factor as to whether defendant was in custody was whether he realized he was free not to accompany the officers to the station if he so wished. While the officers here did not testify they advised defendant he need not go with them, that was implicit from the circumstances as they waited while defendant asked permission to leave his employment. It appears defendant believed he could have chosen not to accompany the officers if his supervisor had refused permission for him to leave. Distinguishing this case from those relied upon by defendant is the fact that here, after the 1½ hours of questioning on August 3, defendant was allowed to leave and was driven back to his employment by an officer. Not all station house questioning is custodial. "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." (*Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714.) We cannot conclude in these circumstances that defendant was improperly detained and questioned by the officers on August 3.

Defendant also argues he came to the police station with his father on August 4 as a result of the illegal detention of August 3. As we find there was no illegal detention on August 3, we need not address this contention.

Defendant's final contention is that he was not proved guilty beyond a reasonable doubt as the victim was unable to identify him in court as the rapist. Further, defendant asserts her testimony was not clear and convincing and lacked corroboration in a number of details. Among the factors defendant points to as raising a reasonable doubt are that the victim identified the rapist as two inches taller and heavier than defendant; that defendant had a mustache at the time of the rape which the victim did not mention; and, his alibi that he was at a birthday party at his sister's home at the time of the rape was corroborated by his sister and brother-in-law.

These issues were for the trier of fact who was responsible for determining the credibility and the weight to be given the testimony. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733; *People v. Younge*

(1980), 83 Ill. App. 3d 305, 404 N.E.2d 415, *appeal denied* (1980), 81 Ill. 2d 598.) The trial judge also considered evidence defendant worked at the complex and had a pass-key to the victim's apartment; that he owned a blue and red striped rugby shirt and a pair of zippered boots and, according to his former girl friend, preferred sex while she wore crotchless pantyhose. He had a mole upon his left chest about the size of a dime and closely fit the description given by the victim, although she could not identify defendant in trial. Defendant had just six days before this offense been jilted by his fiancée, who was known as Molly, and during the rape the offender called the victim Molly. Finally, defendant admitted his guilt and wrote out a confession describing the offense which supported the version of events as related by the victim.

Accordingly, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

LINDBERG and REINHARD, JJ., concur.