THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIAM L. WILSON, Defendant-Appellant.

Third District    No. 3—84—0404

Opinion filed May 3, 1985.—Rehearing denied June 12, 1985.

Arthur J. Inman, of Peoria, for appellant.

John A. Barra, State's Attorney, of Peoria (John X. Breslin and Gerry R. Arnold, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCOTT delivered the opinion of the court:

The defendant, William L. Wilson, appeals his convictions for felony murder and armed robbery following a jury trial in the circuit court of Peoria County. The jury further decided that the death penalty should not be imposed, and the defendant was sentenced to natural life imprisonment for the felony murder. A 60-year consecutive sentence for armed robbery was also imposed on the defendant, but the State has since confessed error with regard to the armed robbery conviction and sentence as being a lesser included offense of felony murder. *People v. Abrams* (1982), 109 Ill. App. 3d 901, 441 N.E.2d 352; *People v. Devine* (1981), 98 Ill. App. 3d 914, 424 N.E.2d 823.

On appeal the defendant contends, as did his brother, David R.

Wilson, who was similarly convicted and sentenced and whose appeal is the subject of a separate opinion, that his arrest lacked probable cause and that his statements made and evidence seized subsequent to his arrest should have been suppressed. In addition, the defendant argues that a second search of his residence was improper and that the evidence obtained as a result should have been suppressed. Finally, the defendant argues that his sentence of natural life imprisonment was excessive.

In reviewing the facts presented, we note that the defendant makes no challenge to the sufficiency of the evidence to support the guilty verdicts if defendant's motion to quash arrest and evidence obtained was properly denied. Therefore, the limited issue before us is the propriety of the trial court's pretrial ruling denying the defendant's motion to suppress.

The People first called Officer Michael Bornsheuer, who testified that as a police officer for the city of Peoria he had a conversation with Detective Dale Whitledge at approximately 3 p.m. on November 1, 1983, and as a result of which he and other officers went to two residences on Wayne Street in Peoria for the purpose of a "stake out." Before leaving the station, Bornsheuer had been furnished mug shots of the defendant and his brother, who were to be arrested in connection "with a homicide investigation." After waiting 15 to 20 minutes, the officer saw the defendant and his brother come out of one of the residences on Wayne Street, and an arrest was made of both individuals. The defendant's brother was wearing tennis shoes whose tracks appeared to match those found in the victim's blood at the scene of a murder the day before at the Bi-Sel Novelty Store in Peoria. The defendant was observed wearing brown suede-type shoes which appeared to have blood on them. One of his fingers was bandaged.

Detective Dale Whitledge testified that at approximately 4:20 p.m. on the afternoon of October 31, 1983, he was called to the Bi-Sel Novelty Store in Peoria, where he found Marion Wood, a man 55 to 60 years of age, lying dead on the floor in front of the store. The decedent had many stab wounds on his body, face and back. The victim's throat had been slashed. The decedent had also been stabbed in one of his eyes. The body was still warm, suggesting that the murder had occurred recently. There were tennis shoe prints in blood beside the victim's body. Whitledge examined the cash register in the store and found only various papers and some pennies. The crime scene was processed for fingerprints. A receipt book bearing the date of the murder indicated that a knife had been sold for $9.30.

A next-door neighbor, Mr. Swearingen, reported that the decedent had been alive as late as 3 p.m. and that he had found the victim dead on the floor at about 4 p.m. and called the police.

Herman Capshaw later told the police that he had been in the store on the afternoon Wood was killed and that there had been two men in the store talking to Wood about buying a television set. Capshaw's description of the men generally matched the description of the defendant and his brother. The men had left without making a purchase but told Wood that they would return before closing time. After the two men left, Wood told Capshaw that it was a shame someone so young had been in prison. The investigating officers therefore concluded that the victim knew at least one of the two men. Capshaw arrived at the shop between 2:30 and 3 p.m. and left about 3:30 to 3:40 p.m.

An interview with Barbara Skeen at a business immediately west of the novelty store indicated that she had been at the Pour House Tavern, approximately 40 to 50 feet from the victim's shop, and overheard a woman named Evelyn telling two customers that her son had come home the evening before with blood all over him and a severe cut on his finger.

The police contacted Evelyn Wood at the Pour House Tavern, who identified herself as the defendant's mother. She stated that her daughter-in-law, Cheryl Wilson, had come to her house on the morning of November 1, 1983, the day after the murder, and told her that her husband, the defendant, had come home the night before with blood all over his clothes and a severe cut on his index finger. Cheryl had told her mother-in-law that her husband claimed he had been in a fight with some blacks who had raped a five-year-old girl on Main Street. Evelyn told the police that both her sons had been in trouble with the police before and that they had been drinking in the Pour House Tavern on the day of the nearby murder.

The description of her sons matched that given by Capshaw as the two men in the shop with the decedent just before his death. Mrs. Wood said David was red haired, carried a chain-type wallet with a buck knife on a sheath in his belt, and that the defendant was thinner and shorter than David, with black hair and a beard.

A Miss Crim told Whitledge that she had been the bartender at the Pour House Tavern on the day of the murder and that both defendants had been in the tavern drinking beer from approximately 11 a.m. until 3 p.m.

Whitledge also interviewed Richard Curtis, an employee of a nearby Firestone store, who told him that on the afternoon of the

murder he had seen two men matching the description of the defendant and his brother walking down an alley near the novelty store. One of the men, the bigger one, carried a chain-type wallet with a knife pouch worn upside down so that if the sheath were unsnapped, the knife would fall out.

When Whitledge returned to the police station, he was told that a fingerprint found at the scene was left by the defendant's brother, David.

Armed with the foregoing information, the police decided to take the defendant and his brother into custody.

■■ We believe that exigent circumstances required that the police act quickly to apprehend the persons who had murdered the decedent. The evidence obtained at the scene of the crime indicated that the attack had been a vicious assault, with multiple stab wounds on the victim's body, face and head. The decedent's throat had been slashed and he had been stabbed in the eyes. Certainly the police could reasonably have concluded that the assailants were armed and dangerous. While it may have been preferable, in hindsight, once they discovered that the defendant's brother's fingerprint had been left on a glass display case in the novelty store (which had been left open with a knife missing), to pause and conduct a photographic lineup with Mr. Capshaw and the other witnesses in the area before arresting the defendant and his brother, it is no less clear that the trial court properly determined that at least probable cause existed for the arrests now being challenged.

■■ It is not necessary that the information available to the police prove a defendant's guilt beyond a reasonable doubt in order to justify an arrest. (*People v. Coleman* (1977), 50 Ill. App. 3d 1053, 364 N.E.2d 742.) Practically speaking, both the trial court and this court are reviewing the officer's conduct after the fact, and a determination of whether probable cause existed must likewise be based upon the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. *People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861; *People v. Gray* (1981), 95 Ill. App. 3d 879, 420 N.E.2d 856.

■■ Probable cause exists when the facts and circumstances within an arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested committed the offense. *People v. Willingham* (1982), 89 Ill. 2d 352, 362, 432 N.E.2d 861, 866.

■ In judging whether probable cause existed, it must be recognized that police officers must act upon a quick appraisal of the data

before them and that the reasonableness of their conduct must be judged on the basis of their responsibility to prevent crime and to catch criminals. *People v. Walls* (1980), 87 Ill. App. 3d 256, 408 N.E.2d 1056; *People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356.

During oral argument, defendant's counsel indicated that while there may have been probable cause to arrest defendant's brother since his fingerprint was found at the scene of the murder, there was no corresponding fingerprint evidence which placed the defendant at the scene of the crime.

While we understand the defendant may be compelled to make such an argument, even at his brother's expense, in order to escape the consequences which inevitably flow from an adverse ruling, we nevertheless believe that the defendant's argument is without merit for several reasons. First of all, it was the defendant's own wife who indicated to her mother-in-law, Evelyn Wood, that her husband had come home the day of the murder covered with blood and a severe cut on his index finger. Secondly, a number of witnesses, including Capshaw, Crim and Curtis, all gave descriptions to the police which matched the defendant's description, of *two* men *at* and near the scene of the murder just prior to the murder.

Assuming, *arguendo*, that probable cause was lacking at the precise moment of defendant's arrest, it certainly existed immediately thereafter when the officers legally detained the defendant and his brother on the day after the murder. The officers knew that certain tennis shoe prints had been left in the blood-soaked carpet around the victim's body, and when the defendant's brother was stopped in the company of the defendant, the tennis shoes he was wearing had soles whose tracks appeared to match those found at the scene in the victim's blood. Furthermore, the arresting officers observed that the defendant was wearing brown suede-type shoes which appeared to have blood on them. The defendant had a bandage on his index finger just as his wife had described to her mother-in-law.

We believe that these specific and articulated facts available to the officers supported an investigative stop pursuant to *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. Certainly the fruits of their observations at the time of the defendant's initial detention ripened into sufficient probable cause for the defendant's arrest. *People v. Payton* (1980), 91 Ill. App. 3d 78, 414 N.E.2d 283.

The defendant's explanation for the cut on his finger and the blood on his clothes was highly improbable based upon the information known to the officers, *i.e.*, the police knew that the report of an

attack upon the little girl did not mention the defendant or his brother; there had been no mention of a suspect; and no report of the incident had been furnished by either defendant.

■ Finally, at trial, a police officer who investigated the alleged sexual assault testified that on the night of the victim's murder, the defendants were present when she responded to the report of the assault. In reviewing the propriety of the trial court's denial of defendant's motion to suppress, we may consider evidence which was later presented at trial. *People v. Billings* (1977), 52 Ill. App. 3d 414, 367 N.E.2d 337.

Following the defendant's arrest, each signed a consent to search their respective residences. The police found clothing with what appeared to be dried blood on it in the defendant's house. They also found a paper bag containing pairs of socks, toys and cigarette lighters like those on display in the novelty store, plus a lock-blade knife with blood on it in the blower unit of the furnace in the defendant's residence.

Dale Whitledge, one of the investigating officers, left the defendant's house between 6:15 and 6:30, and it was unclear whether the laboratory unit was still there at that time. At 7:35 p.m., Officer Charles Cannon, acting upon information supplied by the defendant's brother, was directed to go to defendant's residence to retrieve evidence of the blood-covered knife from the blower unit of the defendant's furnace. The knife was not seized until an additional written consent was obtained from the defendant's wife.

When the defendant was told that his brother had confessed to the murder and robbery and implicated him, he acknowledged his participation in the crime.

While the defendant does not challenge the validity of the first search of his residence following his arrest and consent, he claims the second search conducted by Officer Cannon was improper.

The trial court denied the defendant's motion to suppress the evidence seized from the later search on the ground that the defendant's earlier consent, which was not challenged, was sufficient for the subsequent entry. In addition, the court believed that the defendant's wife's consent was knowingly and voluntarily given.

The fourth amendment's prohibition against unreasonable searches and seizures was not violated under the facts of the instant case because there was a pre-existing valid consent from the defendant.

While we recognize that as a general rule of law a consent to search usually involves an understanding that the search will be con-

ducted forthwith and that only a single search will be made (2 W. La Fave, Search and Seizure 633 (1978); *People v. Nawrocki* (1967), 6 Mich. App. 46, 150 N.W.2d 516, *cert. denied*, 389 U.S. 942, 19 L. Ed. 2d 296, 88 S. Ct. 304), this is not to say that this court has not upheld subsequent second searches under appropriate circumstances. *People v. Lee* (1981), 93 Ill. App. 3d 894, 417 N.E.2d 1090.

In the instant case, a police officer re-entered the defendant's residence within an hour after the initial search and remained there for only a brief period to secure specific evidence based upon information provided by the defendant's brother. The defendant had initially signed a blanket and comprehensive consent form which was never withdrawn. *People v. Lee* (1981), 93 Ill. App. 3d 894, 896, 417 N.E.2d 1090, 1092; *Ferguson v. Caldwell* (1975), 233 Ga. 887, 213 S.E.2d 855.

Finally, we believe the evidence would inevitably have been discovered, since the source of the information came from an individual so closely connected with the commission of the crime. The defendant's wife's consent to the search prior to the seizure of the evidence further insured its inevitable discovery. *Nix v. Williams* (1984), 467 U.S. 431, 81 L. Ed. 2d 377, 104 S. Ct. 2501; *People v. Farmer* (1980), 91 Ill. App. 3d 262, 414 N.E.2d 779; *People v. Ruberto* (1980), 81 Ill. App. 3d 636, 401 N.E.2d 1306.

■ The defendant's final claim of error involves an alleged abuse of discretion in the imposition of a sentence of natural life imprisonment. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

As we pointed out in our companion opinion in *People v. Wilson* (1985), 132 Ill. App. 3d 862, the murder of the victim in the instant case, while allegedly not premeditated, was extremely brutal. In sentencing the defendant to natural life imprisonment, the trial court specifically noted the wanton brutality of the crime, the defendant's lack of remorse and eagerness "to party" following the victim's murder. The trial judge considered the defendant's claim of rehabilitative potential but further observed that the ends of justice must also be weighed, *i.e.*, that the deterrence factor required a lengthy sentence.

■ The defendant's claim of a rehabilitative potential was severely compromised by his extensive prior criminal record, which included convictions for possession of stolen property, armed robbery, burglary, theft and possession of cannabis. The defendant's prior sentences of probation, imprisonment for three years and parole had utterly failed to deter him from the heinous crime committed here.

Section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1) permits the imposition of a natural life sentence when the trial court finds that the murder was "accompa-

nied by exceptionally brutal or heinous behavior." The record indicates that the trial court relied upon this section in imposing the sentence, and in our opinion, the trial court was clearly justified in doing so. As we have indicated in our companion opinion regarding the defendant's brother, it is not within our province to reduce the defendant's sentence merely as an act of judicial clemency. *People v. Barber* (1983), 116 Ill. App. 3d 767, 452 N.E.2d 725.

For the foregoing reasons, the judgment and sentence of the circuit court of Peoria County are affirmed with respect to the defendant's conviction for felony murder, and reversed with respect to the defendant's conviction and sentence for armed robbery.

Affirmed in part, reversed in part.

STOUDER and WOMBACHER, JJ., concur.